51 CCPA
**Application of Floyd Stephen MARKHAM and Herald Rea Cox.**

United States Court of Customs and Patent Appeals.
April 16, 1964.

Robert Ames Norton, Stamford, Conn. (William P. Spielman, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C., (J. F. Nakamura, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, C. J., and RICH, MARTIN, SMITH, and ALMOND, JJ.

WORLEY, Chief Judge.

Markham and Cox appeal from the decision of the Board of Appeals affirming the examiner's rejection of claims 8, 14, 15 and 16 of their patent application [1] which relates to a process of preparing a

1. Serial No. 349,986, filed April 20, 1953.

live virus vaccine for various fowl diseases, particularly Newcastle disease, a virus disease of chickens.

Claim 14 reads:

"14. A method of preparing a live-virus fowl vaccine, said vaccine being free of the microorganism causing chronic respiratory disease of fowl, which comprises the step of preparing an aqueous suspension of chick embryo tissue in which live virus is present, adding thereto at least 50 gammas per milliliter of a tetracycline antibiotic and incubating the aqueous suspension for a period of from about 6 hours to 14 days with a temperature ranging from about 0° C. to 50° C. until virus-like microorganisms causing chronic respiratory disease in fowls have been inactivated."

Appellants state that the standard procedure for preparing live virus vaccine is to inject the virus into the fertile egg and then incubate the egg for a period of time. The chick embryo so formed is ground and the solution of the vaccine is separated from most or all of the ground tissue. The resulting vaccine is referred to as "harvested vaccine."

The point of novelty of the process claimed here is said to reside in the introduction of a tetracycline antibiotic in specified amounts to the harvested vaccine, followed by a short incubation period. The function of the antibiotic is to destroy Pleuropneumonia-Like-Organisms (hereinafter PPLO) which cause a fowl chronic respiratory disease known as "roup." It appears that PPLO can be transmitted by the hen to her eggs. If the eggs of a hen having PPLO are used in the preparation of a virus vaccine the fowls vaccinated will develop that disease. The antibiotic will kill PPLO without destroying the live virus in the vaccine, resulting in selective isolation of the virus.

The claims are rejected as unpatentable over several references. The board, however, reached its decision on

> Waksman "Streptomycin," pp. 561–579 (1949) publ. Williams and Wilkins Co.
>
> Groupe et al., J. of Bact., May 1949, pp. 515–528.
>
> Gross et al., Poultry Sci., Vol. 32, Mar. 1953 pp. 260–263.

The Waksman reference is concerned with the isolation of viruses from admixtures with bacteria. It discloses the addition of streptomycin to embryonating eggs "in attempts to isolate Newcastle virus from material contaminated with bacteria." It also refers to the use of streptomycin for the freeing of Newcastle virus contaminated with bacteria from "exudates and tissue suspensions."

The Groupe article discloses that both streptomycin and chlortetracycline kill the agents of infectious sinusitis of turkeys which appellants concede to be similar to PPLO.[2]

Gross et al. teach the control of chronic respiratory disease of chickens with streptomycin, chlortetracycline, oxytetracycline and chloramphenicol.

The board held that the claimed process would be obvious from Waksman's disclosure of the selective recovery of viruses from admixtures with bacteria particularly since the Groupe and Gross references "would suggest the substitution of the tetracyclines for the streptomycin of Waksman."

The principal issue is whether the substitution of chlortetracycline for streptomycin in Waksman's process would be obvious to one of ordinary skill in the art.

Appellants attempt to establish that said substitution would not be obvious by an affidavit of one Kiser to the effect that streptomycin develops resistant strains of PPLO, and an affidavit of one Adler showing "that streptomycin-re-

---

2. Wong et al., Poultry Sci., July 1953, pp. 587–598 was cited by the examiner to show that Groupe et al. and Gross et al. concern PPLO. That point is not challenged by appellants.

sistant strains of PPLO are also found in domestic birds."

Appellants ask us to conclude from those affidavits "that streptomycin is capable of producing resistant strains of PPLO whereas the tetracycline antibiotics are not."

The Adler affidavit says that PPLO is a causative agent of chronic respiratory disease in birds and that streptomycin resistant strains are found in birds. It says nothing whatever about tetracyclines. The Kiser affidavit tabulates the effects of streptomycin and chlortetracycline independently on a PPLO strain of avian origin. Chick embryos in eggs were infected by injection into their yolk sac of a suspension taken from the yolk sac of another embryo which died from a PPLO infection. The embryo was also administered varying quantities of antibiotic. After the infected embryo died the strain of PPLO taken from it was used to inject another embryo containing antibiotic. The PPLO inoculated into the second embryo was referred to by Kiser as the "passage strain." The "parent strain" had never been exposed to an antibiotic. The passage strain and parent strain were regularly compared to determine their relative effectiveness.

The affidavit concludes that both "chlortetracycline and streptomycin are effective in combating the Pleuro-Pneumonia-Like Organism;" and that the PPLO strain tested developed a resistance to streptomycin within 10 passages whereas resistance to chlortetracycline was not developed within 15 passages through embryos treated with antibiotic.

The Kiser affidavit thus indicates that chlortetracycline has some superiority over streptomycin for the instant purpose. However, the difference in the results obtained between 10 exposures of a specific PPLO strain to streptomycin treated embryos and 15 exposures of that strain to chlortetracycline treated embryos does not necessarily support the conclusion that PPLO does not develop a resistance to chlortetracycline. The difference disclosed by the Kiser affidavit is merely one of degree in the effectiveness of the two antibiotics. Since the prior art clearly suggests the use of chlortetracycline as an alternative to streptomycin, the "mere fact that the results attained may be unexpectedly good is not controlling." In re Szumski, 302 F.2d 753, 49 C.C.P.A. 1117.

Appellants further attempt to distinguish their process from that of Waksman on the ground that Waksman injects the antibiotic into the eggs rather than into the harvested vaccine. They point out that an overdose of antibiotic will kill the chick embryos, and "if small amounts of tetracyclines were injected into the eggs they would be so diluted by the embryo tissue that on harvest there would not be the concentration of antibiotic called for by the claims."

Appellants fail to convince us that it is beyond one of ordinary skill, in view of the teachings in the art, to determine an amount of antibiotic that will eliminate PPLO from the harvested vaccine without being lethal to the embryo. It should be remembered that the object of the claimed method is the preparation of live virus "free of the microorganism causing chronic respiratory disease of fowl," and if the PPLO are destroyed before harvesting, the same result is accomplished. The use of an antibiotic for selectively killing PPLO in the production of the virus fowl vaccine being old, we think it is no more than an obvious alternative to apply the antibiotic to the harvested vaccine instead of adding it to the embryo earlier in the process.

Appellants' argument that a reference "must contain a teaching that will meet the claims" is not sound. Waksman alone may not "meet the claims," and therefore not be an *anticipation,* but Waksman, in view of Groupe and Gross, suggests what is being claimed.

The period and temperature of incubation are disclosed to depend on the antibiotic employed, and to vary within wide limits. No assertion of criticality is made, nor do we see any.

The decision is affirmed.

Affirmed.

SMITH, Judge (dissenting), with whom RICH, J., joins.

The majority opinion treats as the "principal issue" the question "whether the substitution of chlortetracycline for streptomycin in Waksman's process would be obvious to one of ordinary skill in the art."

While this issue must necessarily be considered, I do not consider it to be the "principal issue," nor for that matter, determinative. Rather, I think the determinative issues are *two*: namely, would it have been obvious, in view of the prior art, 1) that chlortetracycline would inactivate the microorganism of chronic respiratory disease (PPLO) without harming the Newcastle disease virus, and 2) that such inactivation would be most effectively accomplished by adding the chlortetracycline to a suspension of harvested virus rather than to a fertile egg.

To summarize the facts here, the claimed method removes the danger of introducing resistant strains of PPLO into a vaccine and this is accomplished by introducing chlortetracycline in specified amounts into the live virus after harvesting the vaccine, followed by a short incubation period. The result is that the chlortetracycline selectively kills the PPLO virus without adversely affecting the Newcastle disease virus in the vaccine.

The majority position, with which I do not agree, is:

"* * * The use of an antibiotic for selectively killing PPLO in the production of the virus fowl vaccine being old, we think it is no more than an obvious alternative to apply the antibiotic to the harvested vaccine instead of adding it to the embryo earlier in the process."

In such a highly technical field as that with which we are here concerned, it is, I think, a serious error to dispose of the determinative issues on the basis stated in the majority opinion that

"* * * Waksman alone may not 'meet the claims,' and therefore not be an *anticipation,* but Waksman, in view of Groupe and Gross, suggests what is being claimed."

I do not believe this position will stand objective analysis. It ignores the statement in the specification that:

"It has now been found that *live virus material* for use in a vaccine or as a vaccine *can be selectively sterilized* to kill the chronic respiratory microorganisms *without inactivating the desired virus* by the addition, to an aqueous solution of the virus, of a suitable quantity of a broad band antibiotic followed by incubation of the antibiotic containing solution for a suitable period. In view of the fact that the antibiotics are customarily considered bacteriastatic materials rather than bacteriacidal, surprisingly complete sterilization of the vaccine material is obtained. *This sterilization is obtained with substantially no inactivation of the live virus* and, in fact, the antibiotic appears to exert a stabilizing effect on the vaccine material thus enabling it to withstand an incubation period better than would otherwise be expected." [Emphasis added.]

The claims before us are drawn to cover the method by which chlortetracycline is added to the egg-propagated, live virus for the purpose of effecting such a *selective sterilization* of the live virus material in the vaccine. Thus, claim 8 calls for

"* * * the improvement which comprises treating an aqueous suspension of the harvested virus before drying with from 125–25,000 gammas/cc. of chlortetracycline and incubating the antibiotic-containing solution for a period of from about six hours to fourteen days at a temperature of from about 0° C. to 50° C. until the aqueous suspension is free of the microorganism causing chronic respiratory disease of fowls."

Claim 14 specifically includes:

"* * * the step of preparing an aqueous suspension of chick embryo tissue in which live virus is present, adding thereto at least 50 gammas per milliliter of a tetracycline antibiotic and incubating the aqueous suspension for a period of from about six hours to 14 days with a temperature ranging from about 0° C. to 50° C. until virus-like microorganisms causing chronic respiratory disease in fowls have been inactivated."

Claim 15 calls for

"* * * the step of preparing an aqueous suspension of chick embryo tissue in which live Newcastle virus is present, adding thereto at least 50 gammas per milliliter of a tetracycline antibiotic and incubating the aqueous suspension for a period of from about 6 hours to 14 days with a temperature ranging from about 0° C. to 50° C. until virus-like microorganisms causing chronic respiratory disease in fowls have been inactivated."

Claim 16 calls for

"* * * the step of preparing an aqueous suspension of chick embryo tissue in which live virus is present, adding thereto at least 125 gammas per milliliter of chlortetracycline and incubating the aqueous suspension for a period of from about 6 hours to 14 days with a temperature ranging from about 0° C. to 50° C. until virus-like microorganisms causing chronic respiratory disease in fowls have been inactivated."

To deny claims as specific as claims 14, 15 and 16 on the disclosed novel method of selective sterilization of a live virus vaccine in this very specialized technical field requires, in my opinion, a much more convincing teaching than is to be found in the art here relied upon. The majority opinion purports to find it in Waksman in view of Groupe and Gross which "suggests what is being claimed." The majority opinion does not point out the genesis of the suggestion and I respectfully submit that its genesis in the art before us is to be found only in the above quoted portion of appellants' specification. I am unable to find in the art any suggestion of the claimed *selective sterilization* of a live vaccine *after the virus has been harvested*. It requires hindsight reconstruction to take Waksman's suggestion and modify it by Groupe et al. to meet the claims. In my opinion, the majority opinion indulges in this most speculative reconstruction in a highly developed technical art wherein, however, predictability of results is very limited.

The rejection before us supports itself by repeated dependence on such terms as "suggestions," and "mere matter of choice" and "lack of criticality." Such statements on the ground of rejection create doubts as to the validity of the rejection. I would resolve those doubts in favor of appellant. I find additional support for so doing in the affidavits which were submitted by appellant and which show, *without* doubt:

(1) that the streptomycin of Waksman developed resistant strains of PPLO.

(2) that streptomycin-resistant strains of PPLO are found in domestic birds.

As stated in appellants' brief:

"* * * These Affidavits, the correctness of which is not questioned by the Patent Office, prove that streptomycin is capable of producing resistant strains of PPLO whereas the tetracycline antibiotics are not. This is not a difference in degree. It is a difference in kind because vaccines for Newcastle disease or other fowl diseases which sometimes infect a flock with roup are not saleable and are not useful. An unsafe vaccine is worthless. Kiser's and Adler's Affidavits show clearly this difference in kind. The tetracycline antibiotics do not develop resistant strains; streptomycin does. The Waksman reference does not deny this fact."

I have not found any teaching in the cited references (and the majority opinion refers to none) prior to the filing date of appellants' application that tetracycline antibiotics do not produce resistant strains. As pointed out in appellants' brief:

"* * * It is a difference of enormous practical value, namely the difference between a useful vaccine and one which is not. The immense sales of the vaccines prepared by the present process are eloquent of the practical value of this difference."

While it is true that the Groupe article discloses that both streptomycin and chlortetracycline killed the agents of turkey sinusitis, there is no teaching 1) that streptomycin produced resistant strains or 2) that the causative agents of PPLO and turkey sinusitis were similar. Thus at the time the application in issue was filed, the man skilled in this art, with the prior art before him, would not have known that it made any difference whether streptomycin or tetracycline was used, and there was no teaching in the art that tetracycline had the important properties 1) of not developing resistant strains and 2) was selective in its action in killing the agent which caused PPLO without killing the live but attenuated viruses desired in the vaccine.

Thus, it seems to me that while the general method of producing such vaccines is admittedly old, the novelty of the point at which certain additional and claimed steps were taken by appellants constitutes a patentable feature of the claimed invention, particularly since such steps are carried out at a point in the vaccine production which is *different* from the prior art and is unobvious in view of the teachings of that art.

Should there be any remaining doubt as to the allowability of the claims, it should, it seems to me, be resolved in favor of appellants in view of the evidence of commercial success found in the Aiston affidavit filed April 5, 1956 in which it was stated:

"THAT, since June 1955 and to date the Viral and Rickettsial Production Department under my supervision has continued the production of fowl vaccines by means of said improved method;

"THAT, the production of fowl vaccines by said improved method to date, * * * totals well over a half-billion doses;

* * * * * * *

"THAT, the above production has been sold in the United States, and abroad by the Lederle Laboratories Division of the American Cyanamid Company;

"THAT, all batches of the above vaccines released for sale had satisfactorily passed the safety and effectiveness tests approved by the Animal Inspection and Quarantine Branch of the Agriculture Research Service, U. S. Department of Agriculture; * * *"

For these reasons, I would reverse the appealed decision.